EFTON MARTIN et al., Appellants, v. SADIE MARTIN et al.—No. 38881. —181 S. W. (2d) 544.

Division One, July 3, 1944.

*E. G. Wadlow* for appellants.

*Rufe Scott* and *A. L. Wright* for respondents.

DALTON, C.—Action in equity to quiet title and partition 120 acres of described real estate in Stone county. The court found for defendants on both counts and entered judgment accordingly. Plaintiffs have appealed.

The real estate in question was owned by one Jesse Thomas Martin (hereinafter referred to as Martin), who died intestate December 4, 1919, leaving his widow and eleven children, ten of whom were minors. Ten of these children are now plaintiffs in this cause and a minor son of a deceased son is one of the defendants.

The petition (count 1) charged that at the time of Martin's death the said real estate and other real estate was subject to a deed of trust to secure the payment of a $3600 note; that Martin's widow, the owner of the said note and the trustee in the deed of trust "entered into a conspiracy to cheat and defraud the heirs of Jesse Thomas Martin"; that in furtherance of the conspiracy said conspirators caused the deed of trust to be foreclosed and the real estate to be conveyed to said widow, who executed a deed of trust thereon

1246

for $3586.90; that, thereafter, the said other real estate was sold for $5600 and the entire indebtedness paid; and that, thereafter, in furtherance of the conspiracy the said conspirators caused the described real estate to be conveyed to other persons and by them to certain of the defendants, who knew the facts from the records and so "became trustees of all of such interests . . . for the use and benefit of the heirs of Jesse Thomas Martin, deceased." Plaintiffs asked a decree of title in the heirs of Jesse Thomas Martin, deceased, an accounting of rents and profits, less amounts paid out for taxes, maintenance and improvements, and a declaration that the defendants in possession of the described real estate held as tenants and trustees for the heirs of Martin.

The answer of the defendants in possession of the described real estate (to count 1) denied any fraud, claimed to be the owners and innocent purchasers for value, alleged the making of permanent and lasting improvements and pleaded estoppel, limitations and adverse possession. They further alleged that the foreclosure was for the protection of the widow and children; that the land remained subject to the lien of the original debt of Martin; that said defendants acquired the lands subject to said original indebtedness and paid the same off; and that plaintiffs had full knowledge of the facts for years and had not contributed or offered to contribute any part of the purchase price. Said defendants prayed to be adjudged the fee simple owners of the described lands. The reply was a general denial. The count in partition was in the usual form.

At the time of Martin's death, the land records indicated that the described real estate was subject to two deeds of trust: (1) a deed dated September 12, 1914, executed by Martin and wife, which secured a note for $2083.54 payable to S. P. Wilson; and (2) a deed of trust dated July 15, 1919, which secured a note of Martin and wife for $3600 payable to S. P. Wilson. This latter deed of trust appeared as a first lien on an 80 acre tract, which Martin had purchased from one King on that date for $3600, and as a second lien on the 120 acres, which was the homestead of deceased. It is conceded that these funds were advanced by Wilson to Martin, although Mrs. Martin signed the notes with her husband.

On October 28, 1920, following Martin's death, the deed of trust dated July 15, 1919, securing the $3600 note, was foreclosed and the real estate was conveyed by trustee's deed to Martin's widow for a recited consideration of $3850. The trustee's deed further recited that the conveyance was subject to a "deed of trust for $1763 which is a balance on $2082.54 note shown M page 348." The deed of trust dated September 12, 1914, was recorded in Book M at page 348. On October 28, 1920 (the date of the trustee's deed), Mrs. Martin (the widow and grantee in the trustee's deed) conveyed 40 acres out of the 80 acres, supra, to a Mrs. Emma Ellis for $2000 and the deed of

trust dated September 12, 1914, recorded in Book M at page 348, was satisfied of record on October 30, 1920. On December 13, 1920, Mrs. Martin deeded a 20 acre tract out of the 80 acres, supra, to one Hilton for a recited consideration of $700. On the same date, December 13, 1920, Mrs. Martin executed a deed of trust on the 120 acres in question here and on a 20 acre tract (the balance of the 80 acres, supra) to secure a note for $3586.90, payable to S. P. Wilson. The records show the balance of this note was finally paid by E. H. Parsons (a subsequent grantee of the 120 acre tract) and the record satisfied October 23, 1934. A former agent of the Wilsons testified that he collected "the amount from $3100 to $1000 from Mr. Parsons" and that Mrs. Martin paid no interest and was "behind five or six years" (apparently when she moved from the property). On August 25, 1922, Mrs. Martin deeded the remaining 20 acres of the 80 acres, supra, to Robert W. Parks and wife for a recited consideration of $950. There was evidence that the proceeds of the Ellis, Hilton and Parks sales were paid to Wilson. On August 28, 1922, a partial release deed, releasing this 20 acres sold to Parks from the deed of trust dated December 13, 1920, was executed by J. Lee Wilson assignee of S. P. ▮▮ Wilson. On November 23, 1920, Mrs. Martin conveyed still another 20 acre tract, not a part of either the 120 or 80 acre tracts, supra, to a son (Jesse) for a recited consideration of $1000. Mrs. Martin testified that this sum was paid to Wilsons, but her son testified that he paid his mother $200 for this tract; that "Wilson got the $200"; and that the balance was handled by "satisfactory arrangements." On October 10, 1925, Mrs. Martin deeded the 120 acre tract, supra, to one Harris and wife for a recited consideration of $500. This conveyance was made subject to the deed of trust of December 13, 1920, from Mrs. Martin to J. Lee Wilson, Trustee for S. P. Wilson, which secured a note for $3586.90, but there is no evidence showing the exact amount of principal or interest due on the note on that date. On November 3, 1926, Harris and wife sold the 120 acre tract to defendants Parsons and wife for $4650. The conveyance to Parsons and wife was made subject to the above deed of trust of December 13, 1920. There was a balance of $3100 due on the note on that date and Parsons assumed it and subsequently paid it.

Both S. P. Wilson and his brother and business associate, J. Lee Wilson, the trustee in the deed of trust and assignee, mentioned supra, had died prior to the trial, and their records were not available. The $3586.90 note, supra, was in the possession of defendant Parsons and, on the back thereof, recited that a balance of $3100 was due thereon on January 1, 1926. It further showed a credit of $406 on November 3, 1926, with a balance of $2850, and showed that the 20 acres sold to Parks was released by "Q C D September 9, 1922."

The evidence further showed that the last deed of trust of July 15, 1919, covering the 120 and 80 acre tracts, was foreclosed and

title taken in the name of the widow by some agreement between the widow and the holder of the notes secured by the two deeds of trust. Mrs. Martin testified that she didn't borrow any money from Wilson and didn't have any money to pay the debt; and that she "gave a deed of trust back to Wilson for the old debt and stayed on until Harris took the place" in 1925. She further indicated her belief that, when the deed of trust was executed after the foreclosure, she only owed the amount evidenced by "the deed of trust for $3586.90," and this apparently was correct, since it was dated December 13, 1920, and the deed of trust dated September 12, 1914 had been released by marginal entry on October 30, 1920. This note and deed of trust, dated December 13, 1920, was made after the sale of the 40 acres to Mrs. Ellis for $2000 and apparently after the sale of 20 acres to Hilton for $700. While the trustee's deed to Mrs. Martin on October 28, 1920 shows that the conveyance was subject to a $1763 balance due on the deed of trust recorded in Book M at page 348 (dated September 12, 1914), her deed of trust of December 13, 1920, securing the note for $3586.90 (due one day after date and with 8% interest from date), makes no reference to a prior deed of trust and her deed of trust did not describe the Ellis or Hilton lands.

Mrs. Martin further testified that her son bought the homestead property in at the foreclosure sale and the deed was made to her. The son testified that he bid the property in at the direction of the trustee, J. Lee Wilson. After the execution of the deed of trust dated December 13, 1920, the widow made only the deeds to Parks, to Jesse Martin and to Harris and wife. The evidence indicates that the original plan was for the widow to sell off enough of the real estate to pay the total debt or to reduce the amount so that the widow could handle it and retain her home. There was also evidence that she was present when her sons made an unsuccessful effort to sell part of the remaining 120 acres for enough to pay off the remaining indebtedness, and that she finally decided she could not pay for the property and gave it up. The evidence indicates that all sales were handled by the Wilsons, except the sale to Jesse Martin. While deed to Harris recited a consideration of $500 and was made subject to the deed of trust securing the balance of the $3586.90 note, Harris testified that he paid Wilson $300 or $350 and Wilson "held the mortgage." Mrs. Martin denied that she ever signed this deed to Harris and wife. She further testified that she "didn't sign no papers"; and that they (the Wilsons) never talked to her "about wanting the money after the foreclosure until Lee (Wilson) died." She said that in 1925 Price (S. P. Wilson) gave her $5.00 "to get out" and ordered her off the place (120 acre tract) in thirty days and that she moved away from the place when Harris took charge. In this connection, one of her sons testified that "Wilson sent a deed with $5 and asked her to sign it and send it back." He further said "she remained with

me after she lost her land.'' The same son further testified that his ''mother didn't receive anything from Wilson at the time she bought the land in and Wilson didn't loan her any money.'' Mrs. Martin further testified that her husband only owed $3600 on the entire farm; that she sold off enough land to pay the entire indebtedness, as directed by Lee Wilson; that Lee Wilson told her she had paid all she owed him; and that she handled things as Lee Wilson told her, until he died. After the widow and children moved from the farm in 1925 they continued to live in the same vicinity and saw the 120 acre farm in question improved by those now in possession.

There was evidence that the premises and improvements were in a badly run down condition when the widow and children left late in 1925; that the defendants (now in possession and claiming to own the 120 acres in question) had expended $3443.00 for improvements; and that the property had doubled in value, due to improvements. The evidence concerning the value of the property is indefinite and uncertain. Plaintiffs' evidence tended to show that the ''old Martin place'' was worth around $5000 in October 1920, and was worth from $2500 to $5000 at the time of the trial, while defendants' evidence tended to show the property was worth $2500 to $3000 in 1926 and about $5000 at the time of the trial. On this issue, the trial court found that the entire property was worth not over $5000 when Martin died; that the indebtedness against it exceeded $5600; that the widow sold off some of the land and applied the proceeds on the indebtedness, until only the home tract remained; and that she was unable to pay the balance and accumulated interest and so parted with all title. There was no evidence concerning the value of rents and profits or the amount of taxes paid. The youngest of Martin's eleven children became 21 years of age on March 28, 1940, and this suit was instituted on July 21, 1941.

Appellants contend that this action is one ''to declare a constructive trust''; that when the deed of trust dated July 15, 1919, was foreclosed in October 1920, the $3600 debt against the described real estate ''so far as the heirs of Jesse Thomas Martin is concerned was fully paid and cancelled''; that ''the widow being the natural guardian of the eleven children, ten of whom were minors . . . took title . . . as trustee for the use and benefit of the minor children; that as such trustee she ''was not authorized to execute the deed of trust for $3586.90''; that ''the Wilsons were paid more than the amount of money they had advanced to J. T. Martin''; that ''on death of the husband, the widow was entitled to possession of the real estate until her dower was assigned and no dower was ever assigned''; that ''the purchaser of the homestead from the widow'' took title with full knowledge of the homestead rights of the minor heirs; that subsequent purchasers took title with knowledge of said rights; that ''all the title that passed from the widow was a relinquishment of her un-

assigned dower or quarantine rights"; that the widow had quarantine until dower was assigned; that the widow and minor children had homestead rights, until the youngest child became of age; that such minor children were under no duty to protect their interests; and that the trial court "failed to apply the rules of equity." Appellants rely primarily upon the land records of Stone county and seek to recover the real estate free from liens and encumbrances, since they insist the debt was paid and the widow could not legally execute the deed of trust of December 13, 1920. Appellants make no tender of any sums for any purpose and do not offer to do equity in the premises.

We think the evidence satisfactorily establishes that, at the time of Martin's death, the described real estate was subject to two deeds of trust securing an indebtedness in excess of $5600; that all rights of quarantine, homestead, dower and remainder acquired by the widow and heirs of Martin were subject to this outstanding indebtedness; that the widow and heirs were wholly without funds to redeem the real estate from this indebtedness; that the last deed of trust was foreclosed and title placed in the widow in good faith in an attempt to liquidate the indebtedness and leave a home for the widow and children; and that after the several sales of real estate had been made and the net proceeds applied to the indebtedness there was yet outstanding and unpaid $3100 of the balance of the purchase price at the foreclosure sale, which debt was evidenced ▌▌▌ by the note and deed of trust executed by the widow after her purchase of the property. This amount further evidenced the unpaid balance of the original indebtedness, which constituted a lien upon the described real estate at the time of Martin's death.

We are not unmindful of the widow's testimony that when her husband died he only owed $3600 on the farm; that the Wilsons collected the full consideration recited in the Ellis, Hilton, Parks and Jesse Martin deeds, some $4650; and that the debt was fully paid. Some of this testimony, however, is contradicted by the testimony of other witnesses and it is in effect contradicted by the acts, conduct and other testimony of the widow, as well as by conceded circumstances and by some documentary evidence. There is, of course, no evidence as to the amount of accumulated interest, taxes or other items or any satisfactory evidence concerning the amounts actually paid and the actual disposition of the proceeds, but the more reliable evidence (particularly in view of the lapse of time) indicates that a balance of $3100 was due and unpaid when the widow and children moved away from the property. No part of this balance or any interest thereon has ever been paid by the widow or heirs and the heirs seek the aid of a court of equity to recover the described real estate without paying any part of the amount paid to acquire the superior title at the foreclosure sale.

The facts in this case are similar to the facts in the case of Willoughby v. Brandes, 317 Mo. 544, 297 S. W. 54 and that case is decisive of substantially all of the issues here presented.

When the widow purchased at the foreclosure sale she acquired the legal title to all of the real estate described in the trustee's deed, but, in view of her relationship to the heirs of her husband and her relationship to the property, the legal title she acquired was subject to certain equities. As mother and surviving parent, she was the natural guardian and curatrix of her ten infant children and had them in her care and custody. Sec. 375, R. S. 1929, Mo. R. S. A., Sec. 375. She was also a co-tenant with them of the homestead estate. The husband and father had had a homestead in the equity in the 120 acres of described real estate, prior to the purchase of the 80 acres, mentioned supra, in 1919, and his homestead passed to his widow and minor children upon his death. Sec. 612, R. S. 1929, Mo. R. S. A., Sec. 612. Any right of the widow to quarantine, or to the assignment of dower, is immaterial to any issue presented here, particularly in view of the fact that the widow and her children were in possession of the homestead, occupying and using it as such.

While all rights of the widow and children in and to the described real estate were subject to the existing liens, which equaled or exceeded the market value of the premises, the widow by reason of her relationship to her minor children and to the property was in no position to acquire the title at the foreclosure sale and to hold it for herself against her children. Willoughby v. Brandes, supra; Annotation 54 A. L. R. 874. It was under such circumstances, however, that the widow did in fact acquire the legal title. Accordingly, she took the title in trust for those of her co-tenants who might thereafter elect to participate in the benefits of her purchase by contributing within a reasonable time their proportionate share of the purchase money. In view of the evidence indicating that her subsequent grantees knew the facts, these grantees took the legal title from her subject to the same equities. The amount of contribution that would have been required in order to secure the benefits of the outstanding title depended, of course, upon the amount expended to acquire such title. We think the evidence clearly shows that it required at least $3100, over and above the amount received from the sales of other real estate, to clear the title to the real estate in question. The widow, being unable to pay this balance, transferred the legal title to Harris and wife, subject to the indebtedness, and they in turn transferred the title to Parsons, who finished paying off the indebtedness. Appellant's contention that this payment by Parsons was voluntary, because the deed of trust was not a lien and because the debt was barred by limitations, is without merit.

Respondents, by their answer, in effect, admitted that the appellants at one time had the right to contribute their proportionate

1252

share of the original debt, or expenses of obtaining the outstanding title, and to thereby obtain the benefit of the acquired title. Appellants, on the other hand, by their petition conceded that the respondents were entitled to deduct from rents and profits all amounts paid out for taxes, maintenance and improvements, but the appellants in their petition, in the trial and on this appeal disclaim any obligation to contribute any part of the sums paid out by the widow or her grantees to acquire, protect and secure the title acquired at the foreclosure sale. The reasons are clear from the evidence, as the trial court found. The present value of the property does not exceed the value of the amount so paid out, plus interest and a reasonable allowance for permanent improvements.

One of the appellants was of age at the time of the foreclosure sale and all have since become of age, yet not one of them has elected to pay or offered to pay his or her proportionate share of the expense by which title was acquired at the foreclosure sale. All of the appellants, except perhaps the youngest child, are clearly barred from obtaining any equitable relief by reason of unreasonable delay, in seeking to recover the property and because the property has been improved and enhanced in value during such delay. Souders v. Kitchens, 345 Mo. 977, 137 S. W. (2d) 501; Cockrill v. Hutchinson, 135 Mo. 67, 36 S. W. 375; Ready v. Smith, 170 Mo. 163, 174, 70 S. W. 484; Roby v. Smith, 261 Mo. 192, 199, 168 S. W. 965. The youngest child, however, is barred from any equitable relief, and so are the other plaintiffs, because, since they have become of age, and since the institution of this suit, they have failed to contribute or offered to contribute and deny any obligation to contribute their proportionate share of the total expense of acquiring the title at the foreclosure sale, the benefit of which title they now seek to enjoy. Beedle v. Campbell (Eighth Circuit), 100 F. (2d) 798, 802. Appellants, therefore, have no standing in a court of equity and they have no interest in the described real estate. The trial court did not err in finding for defendants on the first count, nor in denying partition (second count).

The judgment is affirmed. *Bradley* and *Van Osdol*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.